Case number 24-3473 from the Western District of Missouri, Don Gibson et al. v. James Mullis, etc. I please the Court, we continue with the Gibson case, follow on to the other. And let me first say, we're not opposed to global peace. But you have to have, meet the procedure requirements if you're going to have this kind of global peace. And, by the way, the Batten case is going to continue because, regardless of what happens here, there are still buyer claims where they didn't purchase. But the Gibson case, the settlement agreement is the same. For all pertinent purposes, it's the same as the others in the other case. The order approving the settlement is, in logic, the same. Now, the Court made a couple of shifts. It added a bunch of stuff about Mullis, but the rationale is the same. The notice, the notice did change. The original notice said nothing about the Batten case, said nothing about buyer claims. There was a later notice that added references to the Batten case, and then a third notice. But the original one, we think, is the one that expresses the intent of the settlement agreement. The issues are all the same. The claim form is all the same. It still doesn't ask anything about purchases. But I want to refer to an aspect that appears in the Gibson opinion. It references Wright and Miller. It says that when you have interests that are divergent or antagonistic, then you have to do more than just say, oh, it's all okay. Attorney for NAR said three-quarters of the members of the class bought and sold. But that means one-quarter didn't. And we have no promise here, no one standing up for these people who had both claims, to ensure that they get the value of both claims and not just the value of one. This Court can provide that kind of assurance. Thank you. Thank you. Mr. Nye. May it please the Court, once again, Patrick Nye for the South Carolina Objectors. We've heard a lot the term copycat a lot today. The Burnett case was a copycat, by the way, as well. There's nothing wrong with taking a good idea and using it. And that's what we've done in South Carolina. But in South Carolina, instead of suing national brokers, we've sued the boots on the ground, the local realtors. And those local realtors are the ones that actually committed the conspiracy. And they've paid nothing. There's no consideration that they have paid for the conduct that they have committed. So we say that the settlement as to the local realtors is null and void. Secondly, I've used the word fiduciary. That's a high duty. Did the Court use a high duty here to really dig down and find out whether this was adequate? I think the clear answer is no. A question, a point was made that the Court said even if the Court did not waive the objectors' rights, that the Court would have still found the same way. Then why waive them? Why waive them? The Court acknowledged that there were letters sent about the cost of travel and family requirements. And the Court ignored those. This is not an attorney-driven objection. These objectors came to us after publicity that we received when the JPML in Charleston, South Carolina, declined to give an MDO. Thank you. Mr. Buckman? Michael Buckman for the Redney objectors, Your Honors. I just want to start out by saying that my colleagues on the other side said that in the Burnett case, that the Redney conspiracy was part of the Burnett case from the outset. But Redney was not named as a defendant in that case. Redney was not even mentioned in that case. The Redney market, the New York residential real estate market, is a $22 billion per year market. That's a big market. It's one of the largest markets in the country, and it wasn't mentioned in the initial Burnett complaint. We mentioned that in our New York case, we mentioned the Burnett action for the context, because we wanted to provide the Southern District of New York Court judges with context, advising them of similar litigation pending outside the district. That is why the Burnett action was mentioned in our complaint. Gibson was filed after the March action was filed. That demonstrates that Redney was a complete afterthought. The Gibson complaint by itself demonstrates that Redney was an afterthought. Redney's only mentioned once, you heard, in paragraph 182. There was no detailed explanation of how Redney was part of the overarching conspiracy that they're claiming. And for all those reasons, we respectfully rest our argument. Thank you. Thank you. Ms. White or Mr. McCrite, you're going to go first? Yes. It was switched around on my list, and I missed it. Sorry. Thank you, Your Honor. Scott McCrite, for what I promise, is the last time. We've been here nearly two hours, and I know the court has been very patient, and some of these issues are overlapping between the three cases, and some of the arguments are becoming repetitive. I'm very happy to answer the court's questions, but failing that, I'd like to just step back briefly and kind of look at the 30,000-foot view of what these settlements are about. And after all the discussion this morning, none of the objectors have presented any realistic alternative to these settlements. What would happen if these settlements were to be rejected for any reason? Well, the litigation would splinter immediately. In Burnett, we would go back down to having a $1.8 billion judgment trebled to $5.4 billion. There would be more litigation. There would be post-trial motions and appeals to this court, and probably a cert petition. And the defendants, through all that, wouldn't be able to pay the verdict, the Burnett verdict alone. The next thing up would be trial against Anywhere and REMAX, because they settled before trial, and that's ready to go. And if we were successful in that, then they too would become jointly and severally liable for the $5.4 billion verdict. And they wouldn't be able to pay it either. Then, after that, trial would go in the Morrill case, which is fully certified and ready to go in 20 more big markets. And if we were successful there, there would be an even bigger judgment that none of the defendants would be able to pay. One of the arguments then raised as to that none of the defendants are able to pay is that while that information may well have been in your party's possession, it was not made fully available to the court, and that the court has somehow breached its fiduciary obligation to review the entire record because the court never demanded a full accounting. What's your response to that? Yes, Your Honor. The district court has very broad discretion in determining what it's going to base its rulings on. And in this case, we submitted declarations from members of the court, which is kind of a big deal. And the district court relied upon those. And when the objectors say that they didn't have enough information so they could produce some sort of independent accounting, that's not really the standard. The standard isn't whether the objectors are satisfied. The standard is was the district court satisfied. And the district court could and was very – when it needed more information, it was not shy about asking for it. And their argument is that the district court relied too heavily on a declaration that was made by someone who was tied so closely to an interested party that it was somehow unreliable. Are you aware of any case where that was the basis for a rejection of an evidentiary state? I'm not aware of that, Your Honor. And, you know, it goes further than that. There were not only declarations by a CPA who was in a law firm. There were declarations of the lawyers themselves. I mean, we submitted declarations saying this is how the settlement negotiations went. And, you know, that happens in every case I've ever been involved in. And, you know, it happens. But the objection is that when one asserts that they are on the verge of bankruptcy, that something more needs to be done to make that inquiry. And what would your response be to that? Yeah, my response would be that there's no independent – the court doesn't have to appoint a special master to do some sort of independent audit. And especially when, in this case, it just made perfect sense. I mean, right? These companies, some of them are publicly traded. I mean, you can just look at their 10K and see that they can't pay $5.4 billion in Missouri, let alone having it go all over the country. So there's no right to discovery for an objector. The objector has to come forth with something that would indicate, hey, maybe there's more to the story here. And these objectors never did. And so, I mean, they submitted some affidavit from a retired professor, I believe, and saying, well, we used a different accounting method, and he looked at years that weren't really current. And, I mean, they had objections. But the district court said, no, I've looked at that, and that just doesn't raise a question in my mind that it makes perfect sense that these defendants have a very real limitation on their ability to pay this judgment. This would ruin one of the defendants that's left is Berkshire Hathaway. I don't know if they're going to be able to pay it either, but I guess we'll find out. So that's what the district court was thinking. And I think this idea that doing nothing is not a vote, I didn't even talk about the 28 million class members that did nothing. What I mentioned was 2.5 million people who affirmatively submitted claim forms. That's an affirmative act that they want to be part of the settlement against 39 opt-outs. Thank you, Mr. McRae. Thank you. Ms. Voights? Thank you, Your Honors. I think I'm the last one to stand up. My name is Anne Voights. I represent England Volkers, but I'm also presenting argument on behalf of all of the defendant appellees in the Gibson matter. And I will be brief because we've covered many of these issues. I'd just like to address a couple of the points made by my friends on the other side and a couple of the court's questions and, of course, answer any questions the court may still have. My friends on the other side say they're not opposed to global peace, but the conditions that they are asking for would make obtaining global peace in a class action, particularly nationwide class action, virtually impossible. There's no reason for those requirements. The district court more than satisfied Rule 23's requirements and the requirements that this court has imposed in the past. First, I'd like to address the question about it being with respect to what the court had to do in terms of the findings about financial status. We do think that it was more than adequate for the court here to rely on class counsel who litigated these cases for years to look at the declarations, which were made by people with forensic accounting experience, to look to the fact that what the objectors had done didn't actually give any reason to suggest that there was a ground for discovery here. Courts have generally, as my colleague, Mr. McRae, pointed out, rejected those requests absent some showing of collusiveness or some indication that the settlement just doesn't make sense. This settlement obviously made sense, and there's nothing in the record that suggests that the district court was wrong or abused its discretion in reaching that conclusion. I'd also like to address the buyer-seller issue. First of all, I wanted to emphasize the fact that this was a settlement where they had the option to opt out, and the only claims, the only class members here are people who are engaged in a sales transaction. They may also have had a buying transaction track. The majority of the class did. But to be clear, anyone who only had participated in buying is not part of this class and have released no claims. In their replies, the plaintiffs focus on or the objectors focus on two things. One, they sort of argue the same factual nucleus, and second, they rely on Missouri contract law, and I'd like to address both those points since they were raised in the reply. First, with respect to Missouri contract law, nothing in Missouri contract law requires this court to misread the scope of the release. Here, the language of the released claims in all of the settlement agreements was broad. It was intended to encompass both the claims that were pled and the claims that could have been pled based on this language. And when in addressing who the released parties were, it specified that there was a narrower scope of relief for individual brokers. But that exception from the exception for the release that said it still released claims that a class member paid an excessive commission or home price due to the claims at issue makes it clear that both seller and buyer claims by the class members were being released. That was certainly appropriate, and nothing in Missouri contract law requires this court to set aside common sense in reading the language of that release or determining whether it's consistent with Rule 23. Finally, I'd like to address the case that the objectors rely on heavily in their replies, the Superior case. First, I'd point out that when we're talking about revenue and the scope of the release there, first, the scope of the release is entirely consistent with the way the Eighth Circuit has applied the common nucleus of operative fact. It's consistent even with the Second Circuit. When this court looks at the way the Second Circuit has ruled, to begin with, Spuds, first one, involved claims where the named plaintiffs were releasing claims that they didn't have, and second, that the notice didn't tell the class members that they would be releasing. That is very different from the situation here. Second, the Superior Court involved a case where there was first a claim brought about trademark infringement, and then they sought to bring a later claim for patent infringement. Those two involved very different facts, and, in fact, the court said in that case you could not have brought the patent infringement claim because the patent infringement depends on the use or sale of the product as opposed to the advertising that was at issue in the trademark sense. Again, that is very different from here. What we're talking about is allegations about a nationwide conspiracy, and a nationwide conspiracy where all of these entities were part, where all of the rules operated in the same way, and any differences that the district court properly found within its discretion were slight and insignificant and no reason to overturn the settlement that was reached here. If the court has no further questions, I'm certainly happy to submit. Thank you very much. We appreciate your argument today.  May it please the court. You may. Patrick Nye again for the South Carolina Objectors on rebuttal, and I would like to yield two minutes to Mr. Layton if the court would allow it. First of all, been practicing law 53 years. I've heard corporate defendants scream we're going to have to file bankruptcy hundreds of times. That's just a corporate trick. We shouldn't be fooled by that. Why this court needs to ask are the financials in this case being hidden from us? Why should not they come in the open in such an important and nationwide decision that impacts millions of people, 35 million people? I think the answer is easy, because they could pay a lot more. In my briefing in one of the cases, I mentioned I think that in the REMAX settlement, the attorney that negotiated the settlement for REMAX got a huge bonus because they were so excited about how little they had to pay. The bottom line here is that the lower court absolutely abdicated its responsibility as a fiduciary, and we just cannot run from that fact. Thank you. Thank you, Mr. Layton. Some of this comes back on the buyer's side to what the same factual predicate means. One of the lawyers referred to the test as defined or as stated by other circuits as the identical factual predicate, somewhat disparagingly. This court has been the same. The home services lawyer earlier pointed out, I think correctly, that the question here, the factual predicate, was whether it was a conspiracy to hire commissions. But for the buyers, that's not the whole question, because there is this perverse incentive to push the buyer into the more expensive home. And if you're thinking about how this would be a trial, how different the buyer's claims would be a trial, think about that an expert is going to have to come in and deal with the question of, okay, if I buy high and sell low, how does this affect me as opposed to if I buy low and sell high? Are we favoring those who are moving upward or those who are moving down? The bottom line is that somewhere, someone has to address the value of the buyer's claims, and it hasn't been done. This court can provide through various means of having that done, whether it's carving out those claims or whether it's giving a seat at the table to someone representing those. We encourage the court to do exactly that. Thank you. Thank you. The case is submitted. The court would just note that briefing and arguments have been helpful, and I'm very impressed with your time management. You did a lot better than I would have done. And I certainly blew enough names so that I'm the most at fault in this morning's argument so far. So that's the way that works. So thank you very much. The case will be decided in due course.